IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Charles B. Stevenson, Jr.,      ) | Civil Action No. 6:06-3479-MBS-WMC |
|             Plaintiff,   ) | |
|        vs.              ) | **REPORT OF MAGISTRATE JUDGE** |
| Michael J. Astrue,        ) | |
| Commissioner of Social Security,   ) | |
|         Defendant.   ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff protectively filed an application for disability insurance benefits on July 10, 2003, alleging that he became unable to work on November 1, 1994. Subsequently, on July 16, 2003, the plaintiff refiled his application, alleging a disability onset date of June 1, 1997. The application was denied initially and on reconsideration by the Social Security

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Administration.  On January 14, 2004, the plaintiff requested a hearing.[2]  The administrative law judge, before whom the plaintiff, his attorney and a vocational expert appeared on June 21, 2005, considered the case *de novo*, and on August 24, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on October 11, 2006.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits through December of 2002 only.  Accordingly, this decision is based on the claimant's condition up to his date last insured.
>
> (2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)    The claimant's affective disorder and disorder of the spine are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).
>
> (4)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.
>
> (5)    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> (6)    The claimant retains the residual functional capacity to perform a reduced range of light or sedentary work.  Given the claimant's back problems, he must be able to alternate between sitting and standing in 30 minute cycles in an eight hour day.  He must avoid ladders or unprotected heights and proximity to

---

[2]The request for hearing was untimely filed; however, the plaintiff established good cause for the late filing.

heavy moving machinery. Because his back pain is exacerbated by heat, humidity, or wetness, he must avoid concentrated exposure to such. Additionally he can only occasionally bend, crouch, kneel, stoop, squat, or crawl. Due to his affective disorder, he must avoid unusual stress.

(7)    The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

(8)    The claimant is an "individual closely approaching advanced age" (20 CFR § 404.1563).

(9)    The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

(10)    Transferability of skills is not relevant in this decision

(11)    The claimant has the residual functional capacity to perform a significant range of light or sedentary work (20 CFR § 404.1567).

(12)    Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rules 202.21 or 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a markers clerk, office helper, ticket taker, parking lot attendant, order clerk, and addressor.

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

3

who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the

4

national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 51 years old when the decision was issued. He has a GED and one year of community college, and has worked as a boiler operator and part-time as a house technician at a drug and alcohol treatment center.

The plaintiff was injured in 1984 when he was lifting approximately 200 pounds of logs and felt a pop in his back.  He continued working after his injury, but has had problems with his back ever since (Tr. 130).

On June 24, 1996, the plaintiff had "extreme pain" after commuting back and forth from Jacksonville where he was training to become a security guard.  Dr. Robert R. Silvera injected the paravertebrals at L1-2 and outfitted him with a lumbosacral corset (Tr. 250).

On July 8, 1996, the plaintiff reported having muscle cramping at night due to being on his feet most of the time at work (Tr. 249).  On July 31, 1996, he reported exacerbation of low back pain while working part-time as a watchman.  The sharp pain caused sudden leg weakness, and he fell.  His pain was located in the L5-S1 distribution with no radiation into the legs (Tr. 248).

On October 4, 1996 he reported having had two  episodes of leg weakness at the hips (Tr. 247), and on November 6, 1996, the plaintiff reported severe low back pain and leg weakness to the point of not being able to walk (Tr. 247).  On November 15, 1996, Dr. Silvera noted that besides disc desiccation at the L1-L2 level, there was nothing else significant "as far as the lower vertebral levels" (Tr. 246).

On February 21, 1997, the plaintiff Stevenson had increased low back pain and stiffness and cramping in his right leg with tight musculature (Tr. 246).  On March 3, 1997, he was still complaining of pain at the L1-L2 level of his lumbar spine (Tr. 245).  On June 25, 1997, he complained of pain in his lower back, tenderness and exquisite pain at the L1-L2 disc level (Tr. 243).  On July 7, 1997, the plaintiff reported he suffered from restless nights, even with medication, and was tired during the day (Tr. 243).  In October he still had significant pain in his lower back and numbness in his right leg. (Tr. 240-41).  In December

6

he reported "severe significant localized pain at L1-L2 levels" despite pool therapy. Dr. Silvera injected the right L2 facet and paravertebrals (Tr. 239).

On January 12, 1998, the plaintiff complained of an exacerbation of low back pain and reported having fallen when his right leg gave way (Tr. 238). He did very well in February and March when he started pool therapy (Tr. 236-37), but in June he had increased pain when sitting on "hard and uncomfortable" chairs in the classroom. (Tr. 235). On July 3, 1998, the plaintiff was started on Prednisone for his low back pain, but when he reported on July 27, 1998, that it had not helped, Dr. Silvera suggested a lumbar epidural (Tr. 233-34). On September 14, 1998, Dr. Silvera reported the plaintiff did well after the epidural block and had no complaints of leg pain and only point tenderness at the L1-L2 level, which Dr. Silvera felt was probably "bony related - after the epidural block." Dr. Silvera gave the plaintiff a Catapres patch for pain control (Tr. 233). In September 1998, Dr. Jyoti Patel injected steroids at the bilateral L4-5, L5-S1 paravertebrals and bilateral sacroiliac joints (Tr. 315-17). On October 26, 1998, the plaintiff reported pain in the high lumbar region but no significant leg pain (Tr. 232). In November and December, 1998, he received dextrose injections in the transverse spinal ligaments (Tr. 230-31).

In January and February of 1999, the plaintiff received additional dextrose injections (Tr. 228-29). In March 1999, Dr. Silvera noted that the plaintiff had good and bad days with his back pain, including a five-day episode of right leg pain. (Tr. 227). On April 13, 1999, Dr. Patel injected steroids at the right L4-5, L5-S1 paravertebrals and bilateral sacroiliac joints. (Tr. 312). On May 14, 1999, the plaintiff reported having problems sleeping at night, (Tr. 226), and in June 1999 he had sharp back pain radiating to the front and lateral abdomen and muscle cramping despite going to physical therapy and remaining compliant with his treatment (Tr. 225). The plaintiff's right leg pain continued intermittently but persistently, and decreased following the epidural injection in July (Tr. 224, 309-11). In

7

September 1999, his leg pain had improved but he still had pain in his right lower lumbar region along the paravertebrals; trigger points were identified from L1 through L5. Dr. Silvera prescribed Paxil "to reduce his reaction to pain by raising the pain threshold (Tr. 223).

On October 4, 1999, the plaintiff reported another exacerbation of low back pain radiating into his right leg. Dr. Silvera recommended another epidural and told him to stay out of school at that time (Tr. 222). The plaintiff had the lumbar epidural on November 1, 1999, but in December he had difficulty sleeping because of the pain, even with medication (Tr. 221-22). On December 21, 1999, Dr. Patel performed a discogram of L1-L2 and concluded that the plaintiff's back pain was secondary to the L1-L2 disc as it "does mimic his pain approximately 80%." He believed that the "other 20% may be the degeneration of other discs that have not been assessed (Tr. 307-08).

On March 31, 2000, following a car trip, the plaintiff reported increased back pain as well as pain radiating down his right leg with give-way. Nerve conduction and electromyographic studies did not show significant radiculopathy. Dr. Silvera referred the plaintiff to Dr. Patel for a consultation (Tr. 216-18).

On May 9, 2000, Dr. Patel reported that the plaintiff's back pain had been getting more severe with some radicular pain shooting down his leg with some weakness, and that the epidural steroid and facet injections had not improved his symptomatology. On examination, he had a positive straight leg rise from supine, tenderness of the bilateral paravertebral areas and the bilateral S1 joints, and a decreased range of motion in the lower extremities to the left at 80° (Tr. 303-04).

In June 2000, the plaintiff complained of muscle cramping in his legs at night and a sharp pain in his axial back not related to any particular activity. Dr. Silvera noted that his back pain seemed to be worsening over time (Tr. 213-14). In July and August 2000, the

plaintiff had bouts of pain in his back and leg, and in October he was in "an elevated pain episode (Tr. 212-13).

In November 2000, Dr. Silvera doubled the dose of the plaintiff's pain medication at night for better pain relief (Tr. 211), and Dr. Patel gave the plaintiff caudal epidural steroid injections with bilateral facet injections (Tr. 298, 301-02, 305). Dr. Patel noted that the plaintiff continued to have pain with radiation down his right extremity from his spine into his hip with some constant back ache. Dr. Patel noted that he had some improvement with the initial epidurals but that subsequent injections did not help (Tr. 130). An x-ray of his hip on December 4, 2000, showed mild degenerative changes (Tr. 211).

In January 2001, the plaintiff had pain over the right sacroiliac joint which Dr. Silvera injected, but by March he had increased pain around the right sacroiliac joint (Tr. 209-10). In April 2001, he complained of right leg pain. To "hold him over" until his next epidural, Dr. Silvera injected some paravertebrals in his lower back (Tr. 208). On May 21, 2001, Dr. Patel noted tenderness along the L4/L5, L5/S1 bilateral facets and sacroiliac joints, and assessed generalized degenerative joint disease, degenerative disc disease, with positive L1-L2 disc findings (Tr. 125). The plaintiff's pain improved following an epidural on May 21, 2007, and he continued to do well in June (Tr. 207). By July 9, 2001, he had pain across the sacroiliac joints and along the lumbar paravertebrals from L2 to L4 bilaterally, and had an exacerbation of low back pain starting at L1-2 and radiating downward to L3-4 (Tr. 206). On August 29, 2001, Dr. Silvera injected the plaintiff's facet joint (Tr. 205).

In October 2001, the plaintiff complained of pain in his right lower back with muscle spasm along the right lumbar paravertebrals and across the right S1 joint (Tr. 204). By November 2001, his pain had worsened in his lower back and down his right leg to the foot (Tr. 203). On December 3, 2001, Dr. Silvera injected the painful areas – the paravertebrals and right sacroiliac joint – to tide the plaintiff over until his epidural (Tr. 203).

9

On December 27, 2001, Dr. Patel noted that following the May injection, the plaintiff continued to have back pain which had increased to the point where he had been using larger doses of narcotic medications and needed another injection (Tr. 119).

On January 4, 2002, the plaintiff reported good relief of symptoms post epidural, but by February 4, 2002, he was in pain (Tr. 202). On March 4, 2002, Dr. Silvera injected both sacroiliac joints and paravertebrals bilaterally to subdue his muscle spasm and pain (Tr. 201). On May 21, 2002, with a preoperative diagnosis of low back pain at L-1/L-2 level with positive diskogram, Dr. Patel performed an IDET (Intradiscal Electrothermal Annuloplasty) (Tr. 116-17). On June 3, 2002, Dr. Silvera reported that the plaintiff was experiencing pain down his leg which was not associated with the IDET, but was in the L5-S1 distribution and over the sacroiliac joint (Tr. 200).

On July 1, 2002, Dr. Silvera noted that the plaintiff continued to have pain down the posterior right leg emanating over the right sacroiliac joint, and that he was using a straight cane to walk because his leg was painful and would give out on him (Tr. 199). On July 18, 2002, Dr. Patel noted that the plaintiff reported that "at times the pain going to his leg is so severe that he is unable to tolerate it." On examination, Dr. Patel reported exquisite tenderness over the bilateral L4-L5 and L5-S1 paravertebral areas and the right S1 joint (Tr. 294-95). On July 19, 2002, Dr. Silvera reported that the plaintiff did well after a sciatic block but after sitting for any length of time he had some numbness in sciatic distribution, and still had some discomfort in his lower back (Tr. 197-98).

On August 23, 2002, the plaintiff reported that his back felt looser after four weeks of pool therapy, but he still had intermittent pain down his right leg in sciatic distribution and soreness across his back (Tr. 196). On September 25, 2002, he reported having had another episode of leg weakness and numbness causing him to fall, and stated he could not get up for 10 minutes because of leg weakness (Tr. 194). On October 24,

2002, the plaintiff had right leg pain and weakness despite pool therapy (Tr. 194). The plaintiff underwent a right sciatic nerve block on November 6, 2002, and did well following the block. On December 16, 2002, he underwent a caudal epidural and had excellent results (Tr. 192).

In February 2003, the plaintiff reported falling into an empty bathtub because his right leg gave way. Examination on February 21, 2003, revealed spasm along his paravertebrals on both sides with pain palpated at L1-2, L2-3, and L4-5 bilaterally. On March 21, 2003, Dr. Silvera noted that his leg pain "comes and goes as it has before" (Tr. 190). The plaintiff received caudal epidural and bilateral facet injections on May 15, 2003 (Tr. 293).

Throughout the summer of 2003, the plaintiff complained of lower back pain and leg pain with numbness, and Dr. Silvera injected the paravertebral and right sacroiliac joints. (Tr. 186-88). On October 14, 2003, the plaintiff reported that his right leg pain was worse and becoming more frequent along with lower back pain. Dr. Silvera noted that the injections from his last visit had worked for a while but the pain had come back. (Tr. 186).

On October 17, 2003, Dr. Lance I. Chodosh noted that the plaintiff exhibited moderate pain behavior, and was tender to very light palpation in the lumbar area. He was not able to walk very well on his toes, but was able to walk on heels and could squat and rise once, with slight effort. His deep tendon reflexes on his left Achilles were absent, and the ROM for his lumbar spine was decreased (Tr. 151-54).

On October 22, 2003, Louis Legum, Ph.D., a psychologist, reported that the plaintiff's affect was somewhat constricted but appropriate, and he reported difficulties sleeping and diminished energy. Dr. Legum concluded that "[t]here are absolutely no indicants that he is malingering or that he is invested in any true secondary gain," and that

11

he might benefit from some form of supportive psychotherapy.  He diagnosed chronic pain disorder due to general medical condition with a GAF of 55[3] (Tr. 156-62).

On November 14, 2003, the plaintiff reported he was sleeping very poorly at night even with his pain pill, sleeping medication, and Trazodone (Tr. 185).    On December 23, 2003, Dr. Silvera noted that the plaintiff had undergone another caudal epidural, which decreased his back pain from an 8 to a 4, but his right leg was still numb with pain on walking.  The pain improved if he sat, but reoccurred if he sat for too long (Tr. 335).

On November 11, 2003, Dr. Shane M. VerVoort reviewed Dr. Silvera's records for a peer review board.  He felt that the records did not support a relationship between the plaintiff's complaints of back pain in 1994 and his 1984 injury.  He claimed that the pool therapy, further physical therapy intervention, further injection-based intervention not specifically designed to minimize pain from the L1/2 degenerated disc, and further lumbar spine MRI scans were not medically necessary and that the plaintiff had become too dependent upon the healthcare system (Tr. 273-76).

On February 2, 2004, the plaintiff underwent a right sciatic nerve block with excellent results (Tr. 332-33).  On March 15, 2004, the plaintiff complained of lower back pain and a tingling sensation going to his legs.  Dr. Silvera injected three facet areas (Tr. 332).  He noted that the plaintiff had had two months' relief after the right sciatic nerve block but that the pain had returned and he had begun falling again (Tr. 330).  On May 21, 2004, Dr. Patel administered caudal epidural steroid and bilateral facet injections (Tr. 289).

On June 25, 2004, the plaintiff reported that he had fallen the week prior and reinjured his back, increasing his right leg pain (Tr. 329).  On July 23, 2004, he received a

---

[3]A GAF score of 55 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed. 1994) (*DSM-IV*). GAF scores, however, are not a rating of impairment, but rather constitute an assessment of one moment in time rather than a longitudinal assessment. *Diagnostic & Statistical Manual of Mental Disorders - Text Revision* (2000) at 30-32 (*DSM-TR*) (STAT! Ref Library CDROM, Third Quarter 2005).

right sciatic nerve block (Tr. 328).  On September 24, 2004, Dr. Silvera stated they were holding off on any local injections to his back because he had had asthma attacks, which increased his back pain because of the coughing (Tr. 327).

On November 8, 2004, the plaintiff complained of low back and right leg pain and received injections in both sacroiliac joints and facets at L5-S1 and L3 bilaterally and a right sciatic nerve block (Tr. 325-26).  On December 17, 2004, Dr. Silvera reported diminished leg pain with continued back pain over S1 joints and L4-5, L5-S1 bilaterally on compression (Tr. 324).

On February 28, 2005, the plaintiff rated his pain at a 6.5, down from an 8.5 following facet injections (Tr. 323).  The plaintiff received a right sciatic nerve block on April 18, 2005, and Dr. Silvera reported he had good pain relief (Tr. 322).  On May 16, 2005, the plaintiff again had right leg pain in sciatic distribution and had been falling (Tr. 321).

In a residual functional capacities evaluation (physical) completed on March 28, 2005, Dr. Silvera stated that the plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and stand and walk about two hours and sit for about four hours in an eight-hour day. He could sit or stand for 15 minutes before changing positions and had to walk around every 20 minutes for 15 minutes.  He needed to be able to shift at will from sitting, standing, or walking and would need to lie down at unpredictable intervals about four times during a work shift.  He could never twist or climb ladders and could occasionally stoop, crouch and climb stairs.  Reaching and pushing/pulling were affected by the aggressiveness of his back pain, he needed to avoid all exposure to hazards and a concentrated exposure to extreme cold, wetness, and humidity, and he would miss work more than three times a month because of his impairment. The annulus tear at L1/2 and his right-sided sciatica support those limitations (Tr. 318-20).

In a Psychiatric Review Technique form completed on October 29, 2003, a non-examining agency consultant found that the plaintiff's pain disorder was a medically determinable impairment but that it caused no significant limitations (Tr. 163-76). In a Psychiatric Review Technique form dated December 2, 2003, a second non-examining consultant agreed (Tr. 251-64).

In a Physical Residual Functional Capacity Assessment dated October 31, 2003, a non-examining agency consultant found that the plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and could sit, stand and/or walk for six hours in an eight-hour workday (Tr. 177-84). On December 10, 2003, another non-examining consultant agreed (Tr. 265-72).

From July 2005 through January 2006, the plaintiff reported an exacerbation of his asthma and shortness of breath despite inhalers/nebulizer use (Tr. 395, 399, 404, 411). In January 2006, Dr. Angela V. Connaughton diagnosed an obstructive ventilatory defect/chronic sinusitis (Tr. 372-73).

Vocational expert Joanna Vandorkolk said that the plaintiff's past relevant work was as a part-time social service aide, although he did not perform the full range of duties as a social service aide, and as a boiler tender (Tr. 445-46). The ALJ asked the VE to assume that the claimant is 51 years old, has a GED and one year of college, and can perform light work, but is further limited by the following exertional and non-exertional limitations: he needs to avoid ladders, unprotected heights, proximity to heavy moving machinery, and unusual stress, but he can occasionally bend, stoop, crawl, kneel, or crouch and needs a sit/stand option on 30-minute cycles. The VE stated that the plaintiff would not be able to perform any of his past jobs as he performed them (Tr. 447).

When asked to assume an individual with no skills at all and with the same limitations as above, the VE indicated that there were entry level jobs that the plaintiff could

14

perform.  She stated that "using a sit/stand option" there were unskilled light jobs such as marking clerks (209.587-034), office helpers (239.567-010), ticket seller/taker (211.467-030), and parking lot attendants (915.473-010), and sedentary jobs such as order clerks (209.567-014) and addresser clerks (209.587-010) (Tr. 447-49).  The VE testified that if the plaintiff needed to avoid extreme cold, humidity, or wetness, there would only be a 20% erosion of the ticket seller position (Tr. 451).  She stated that her testimony is consistent with the DOT (Tr. 450).  The VE stated that if the claimant could lift a maximum of 20 pounds occasionally and 10 pounds frequently, and sit for about four hours and stand for two hours in an eight-hour work day, sedentary and light work would be precluded (Tr. 450).  If the plaintiff had to lie down at unpredictable intervals up to four times a day, gainful employment would also be precluded (Tr. 450-51).

The plaintiff testified that he has a constant dull pain in his lower back and frequent pain with occasional numbness and tingling in his right leg (Tr. 73), and that his right leg will give out and cause him to fall (Tr. 73, 75, 84, 425).  In a normal day he lies down about two or three times for 30 minutes to one hour to relieve the pain (Tr. 442).  He can drive for about one hour before he needs to walk around and stretch (Tr. 443).  He can walk between 10 and 30 minutes with a break and stand for about 20 to 30 minutes (Tr. 443).  If he sits for long periods of time, he will have tingling and numbness in his right leg and hip (Tr. 84).  He can sleep about one to three hours a night (Tr. 84).  His wife does all the housekeeping and lawn chores (Tr. 74, 433-34).  He goes fishing once or twice a year "for a little while" (Tr. 435) and camper camping a couple times a year (Tr. 444).  In 2003, he took Hydrocodone, Neurotin, Pycnogenol, Celebrex, Zanaflex, Quinine Sulfate, Zoloft, Catapres-TTS-1, and Capsicum Oleoresin, among other medications, daily (Tr. 73, 92-93).  His medications do not completely relieve the pain (Tr. 84, 426-27), and some of them make him drowsy, a little dizzy and kind of weak (Tr. 427).  He has a TENS unit and a back brace.

15

He has had epidural steroid shots when the pain in his back gets really bad (Tr. 438) and sciatic nerve blocks for his leg pain (Tr. 74, 438).

## ANALYSIS

The plaintiff alleges that the ALJ erred by (1) failing to properly assess his credibility; (2) failing to properly assess his residual functional capacity ("RFC"); and (3) relying on vocational expert testimony that conflicts with the *Dictionary of Occupational Titles* ("DOT"). The Commissioner responded by filing a motion to remand the case to an ALJ

> to conduct a supplemental hearing to obtain vocational expert testimony regarding the availability of jobs for an individual with Plaintiff's vocational factors and residual functional capacity, to identify and explain any apparent conflicts between his/her testimony and the [DOT] . . . as required by Social Security Ruling 00-4p, and to elicit a reasonable explanation for any conflict between the DOT and the vocational expert's testimony.

(Def. brief 1-2). The plaintiff opposed the Commissioner's motion to remand, arguing that the case should not be remanded for consideration of this single issue, but instead should be remanded for further proceedings with regard to all three issues identified above. This court agrees with the plaintiff and recommends that the case be remanded for consideration of the following three issues.

### *Credibility*

The plaintiff argues that the ALJ failed to properly evaluate his credibility. The ALJ found that the plaintiff's "allegations regarding his limitations are not totally credible" (Tr. 19). The ALJ noted that the plaintiff's testimony was internally inconsistent on several occasions. Specifically, the plaintiff indicated that his pain had remained the same, but he later indicated that his pain had progressively worsened over the years. When the ALJ asked if he had any hobbies, the plaintiff indicated that he had none. Later in the hearing,

the plaintiff stated that he camped and fished.  He also stated that he completed one year of college after becoming disabled.  The ALJ found these activities inconsistent with allegations of complete disability (Tr. 17).

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

    (1)    the individual's daily activities;

    (2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

    (3)    factors that precipitate and aggravate the symptoms;

17

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

As argued by the plaintiff, the ALJ failed to make the threshold finding of whether the plaintiff has an underlying impairment capable of producing the symptoms alleged.    Further, it appears that the ALJ ignored evidence supporting the plaintiff's allegations, including a positive straight leg rise from supine, tenderness of the bilateral paravertebral areas and the bilateral S1 joints, a decreased range of motion in the lower extremities to the left at 80 degrees, trigger points, limited lumbar spine flexion, the MRI showing disc desiccation at L1-L2, and positive discogram which mimicked his back pain to approximately 80% (Tr. 155, 223, 246, 303-304, 307-308).    Additionally, one of the doctors who evaluated the plaintiff upon request from the Agency stated, "There are absolutely no indicants that he is malingering or that he is invested in any true secondary gain, whether consciously or unconsciously" (Tr. 161).    While the ALJ stated that the plaintiff "benefitted from frequent exercise and lumbar epidurals" (Tr. 15), there is also evidence that the plaintiff continued to have pain despite performing pool therapy (Tr. 239).

The ALJ found that the plaintiff's completion of one year of college after his onset date was inconsistent with complete disability.  However, the evidence shows that the plaintiff started school but could not finish the program because of pain (Tr. 441).  In 1999,

18

Dr. Silvera noted that the plaintiff missed so much school due to pain that he was going to take an "incomplete" so that he would not ruin his grade point average (Tr. 222). Further, the ALJ found that the plaintiff's fishing, camping, long drives, and regular exercises were inconsistent with disability. However, the plaintiff fished only "1-2 times a year for a little while" (Tr. 84). The plaintiff testified that he usually drives to the post office and doctors' appointments, and one time since 1993 he drove between 600 and 650 miles to visit his father's grave site (Tr. 437). Furthermore, there is no indication that the ALJ considered the fact that the plaintiff was deemed permanently and totally disabled under Workers' Compensation in 2002 (Tr. 442). *See DeLoatche v. Heckler*, 715 F.2d 148, 150 n.1 (4th Cir. 1983) ("[T]he disability determination of a state agency is entitled to consideration by the Secretary.").

Accordingly, upon remand, the ALJ should be instructed to evaluate all the evidence in assessing the plaintiff's credibility in accordance with the above-stated law.

### Residual Functional Capacity

The plaintiff next argues that the ALJ erred by failing to explain the evidence upon which he based the plaintiff's mental and physical residual functional capacities.

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. . . .*
>
> The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with

19

an opinion from a medical source, the adjudicator must explain
why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, *7 (emphasis added).

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

In making his RFC assessment, the ALJ afforded the opinions of Dr. Silvera "great weight as he consistently treated the claimant and was in the best position to judge his limitations" (Tr. 16). However, the plaintiff argues that the ALJ, without any explanation, omitted many of the limitations noted by Dr. Silvera from the RFC finding. This court agrees.

Dr. Silvera imposed the following restrictions: the plaintiff could lift 20 pounds occasionally and 10 pounds frequently; he could stand and walk for about two hours and sit for about four hours during an eight-hour day; he could sit and stand for 15 minutes at a time before changing positions and must walk around in 20-minutes intervals; he needed to shift at will from sitting or standing; he would need to lie down approximately four times a day at unpredictable intervals; he could never twist or climb ladders but could occasionally stoop, crouch and climb stairs; and he needed to avoid concentrated exposure to extreme cold, wetness and humidity and all exposure to hazards. The doctor also found that the plaintiff's ability to reach and push/pull was affected by his impairments (Tr. 318-20).

20

After finding that Dr. Silvera's opinion should be given great weight, the ALJ made an RFC finding that omitted a number of the limitations described by Dr. Silvera without any explanation for the omissions. These omissions include the following limitations: standing and walking no more than two hours a day, sitting for only four hours a day, lying down approximately four times per day, shifting at will from sitting or standing/walking, sitting or standing for 15 minutes before changing positions, and impairment in abilities to reach and push/pull.

Further, in the RFC finding, the ALJ found that the plaintiff's affective disorder precluded "unusual stress" (Tr. 17, 19). As argued by the plaintiff, there is no explanation as to how the ALJ arrived at this limitation, and there is no explanation as to what constitutes "unusual stress."

Upon remand, the ALJ should be directed to explain his RFC finding and inconsistencies as required under the above-cited law. "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). Further, in a supplemental hearing, the ALJ should include all of the plaintiff's impairments in his hypothetical question to the vocational expert.

### Dictionary of Occupational Titles

Lastly, the plaintiff argues that the ALJ erred by failing to obtain an explanation for any conflict of the vocational expert testimony with the *Dictionary of Occupational Titles* ("DOT").

Social Security Ruling 00-4p provides in pertinent part:

When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE

21

> . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.

The Commissioner agrees that the case should be remanded on this issue (def. m. to remand 1-2). Accordingly, upon remand, the ALJ should be instructed to conduct a supplemental hearing to obtain vocational expert testimony regarding the availability of jobs for an individual with the plaintiff's vocational factors and residual functional capacity and to identify and explain any conflicts between his/her testimony and the DOT as required by SSR 00-4p.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the defendant's motion to remand be granted in part and the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

October 1, 2007

Greenville, South Carolina

22